IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs December 9, 2020

## STATE OF TENNESSEE v. KEVIN CAPRICE SMITH

**Appeal from the Criminal Court for Davidson County**
**No. 2017-C-1707    Monte Watkins, Judge**

_____

### No. M2020-00181-CCA-R3-CD

_____

The Defendant, Kevin Caprice Smith, was convicted by a Davidson County Criminal Court jury of premeditated first-degree murder, a Class A felony; attempted first-degree murder, a Class A felony; employing a firearm during the commission of a dangerous felony, a Class C felony;  possession of cocaine with intent to sell or deliver, a Class B felony; possession of heroin with intent to sell or deliver, a Class B felony; possession of a firearm by a felon with a prior felony drug conviction, a Class D felony; and possession of oxycodone, a Class A misdemeanor, and was sentenced to an effective term of life imprisonment plus ten years.  On appeal, he challenges the sufficiency of the convicting evidence.  After review, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and CAMILLE R. MCMULLEN, J., joined.

Manuel B. Russ (on appeal), and Anthony Thompson (at trial), Nashville, Tennessee, for the appellant, Kevin Caprice Smith.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Kristen Kyle-Castelli and Ross Boudreaux, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The Defendant was charged in a nine-count indictment with premeditated first-degree murder, attempted first-degree murder, three counts of employing a firearm during the commission of a dangerous felony, possession of cocaine with intent to sell or deliver, possession of heroin with intent to sell or deliver, possession of a firearm by a felon with a prior felony drug conviction, and possession of oxycodone. The State nolle prosequied two of the employing a firearm during the commission of a dangerous felony charges, and the trial commenced on the remaining charges.

At trial, Ronquez Morton, the victim of the attempted first-degree murder charge, testified that he lived in the James Cayce Homes housing project in Nashville in March 2017. On March 28th of that year, he was at the neighborhood park watching his nephew play basketball across the street. From where he was standing, he could see directly across the street. It was a nice day, and other adults and children were outside. Mr. Morton said that he had known Vastoria Lucas, the murder victim,[1] for a short while, and she also lived in the James Cayce Homes. Mr. Morton recalled that he saw the victim at the basketball court, and she walked across the street to talk to him. While he was talking to the victim, a young man approached her and gave her a hug. Mr. Morton did not hear any argument or heated words between the two, and the man walked away after they finished speaking.

Mr. Morton testified that he was still standing next to the victim in the park when he heard gunshots. He recalled that two of the gunshots were directed at him, and he began "running for [his] life." Mr. Morton did not remember anyone saying anything to him or the victim before the shooting began, and he did not see anything after he started running. Mr. Morton recalled that the person firing the gun was an African-American male, approximately 5'6" in height, and was the same person who had hugged the victim earlier.

Mr. Morton testified that he had reviewed video recordings of the events in question and the recordings were accurate. One of the recordings was played for the jury, during which Mr. Morton pointed out the victim and himself talking. At one point, the video showed a man wearing a black coat head in Mr. Morton's direction and start shooting.

Mr. Morton stated that he did not know the Defendant and had never had any arguments with him. Although Mr. Morton did not see the shooter aiming at him, he and the victim were the only ones standing in the spot where the shots were fired, and a bullet struck the building right in front of him after he started running.

Officer Michael Moss with the Metro Nashville Police Department ("MNPD") testified that he was working as a patrol officer in March 2017 and was dispatched to the

---

[1] Because there are two victims in this case, we will refer to Ms. Lucas as "the victim" and Mr. Morton by name.

scene of the shooting. When he arrived, he saw a crowd of people near the playground, and a witness alerted him that "a gold vehicle just left out of here with a temp tag on it." Officer Moss relayed the information over the police radio and then worked his way through the crowd to where he found the victim lying underneath a comforter. She was approximately ten feet from the playground and close to apartment building seventy-seven. Officer Moss started to perform CPR but determined that was going to further harm the victim as there were bullet holes in her body.

Officer Moss obtained the victim's identity from members of the crowd, which an ID in her pocket confirmed. He also learned that Mr. Morton was a possible victim. Mr. Morton told him that he had been standing with the victim when the shooting began and was also shot at, but he was not hit by a bullet. Officer Moss found shell casings around the crime scene. The first set of casings were within a foot of the victim's body and others were found further away near another building.

On cross-examination, Officer Moss acknowledged that the James Cayce Homes area was a high-crime area and that some of the shell casings, particularly those found further away from the victim's body, could have come from an unrelated incident.

Dr. Randy Tashjian, a forensic pathologist with the Davidson County Medical Examiner's Office, performed the autopsy on the victim. Dr. Tashjian testified to his specific findings from the autopsy, including that there was a total of fifteen entrance and/or exit wounds, and five bullets were recovered from the victim's body. Dr. Tashjian could not determine the range from which any of the gunshots were fired. He concluded that the cause of the victim's death was multiple gunshot wounds, and the manner of death was homicide.

The State then read three stipulations by the parties into the record. First, the parties agreed that the surveillance video footage taken from James Cayce Homes was edited but not altered and fairly and accurately depicted the events it captured on March 28, 2017. Second, various items of evidence that were transported for testing were moved in accordance with the protocols necessary to establish an unbroken chain of custody. Third, evidence taken from the scene was properly transported to the MNPD's property room in accordance with applicable policies and procedures. The victim's clothing and the comforter that had been placed across her body were properly treated and stored.

Sergeant Kurt Reddick, a crime scene investigator with the MNPD, processed the scene of the shooting. Sergeant Reddick and his team located fourteen cartridge casings near a bench near a playground, a cell phone, and a shoestring with keys on it. Five cartridge casings were located on the sidewalk a little further away. The team photographed and collected the evidence, as well as prepared a diagram of the scene.

Sergeant Reddick then oriented the locations of various items of evidence on the surveillance video. He also identified items of the victim's clothing that were turned into the property room after being dried to preserve blood evidence.

At this point, the State read another stipulation by the parties into the record. The parties agreed that all evidence collected in relation to this matter from the traffic stop on I-24, which included three pistols and accompanying ammunition, was properly collected and transported to the MNPD property room.

Officer Michael Douglas, a patrol officer with the MNPD, testified that on March 28, 2017, police dispatch issued a notice of a gold sedan with a temporary tag that was possibly connected to the shooting in this case. He was not far from the area of the shooting and soon thereafter saw a car drive by matching the description. Based on his review of the dispatch records, Officer Douglas stated that the call about the shooting went out at 5:32 p.m., and he saw the gold car at 5:36 p.m.

Officer Douglas testified that he and his partner followed the vehicle onto the interstate and though the rush-hour traffic. The gold car began making abrupt lane changes and eventually got stopped behind another police car that had just entered the interstate. Officer Douglas and his partner pulled up behind the suspect vehicle and commanded the individuals inside to raise their hands. The driver and front seat passenger complied but the Defendant, who was alone in the back seat, did not. The other two men in the car were Latraveous Burns and DeAngelo Barton, the co-defendants.

The Defendant was wearing a plain black tee-shirt and black jeans. He had the magazine of a pistol in his lap and was holding a black semiautomatic pistol in his right hand between his knee and the door. Officer Douglas ordered the Defendant to drop the gun, and he complied and exited the car. The Defendant's demeanor "was real tense" and "kind of stern." The Defendant made a broad statement "that everything in the vehicle was his[.]"

Officer Douglas searched the Defendant upon taking him into custody and found a knife and quantities of powder cocaine, crack cocaine, heroin, and pills. The drugs, empty cigarillo packages, and clear plastic baggies were inside a pouch. The Defendant also had a cell phone, a set of keys, and a wallet containing close to $2,000 in hundreds, fifties, twenties, and ones. Some marijuana, two cell phones, three handguns, including the one the Defendant had been holding, and ammunition were found in the car when it was processed. Officer Douglas did not know who the car belonged to, but it did not belong to the Defendant.

- 4 -

Officer Randy Heinze with the MNPD testified that on March 28, 2017, he was sent on a high priority call to the scene where other officers had stopped the gold car. Officer Heinze transported Mr. Barton, one of the co-defendants, to the police station for questioning and then helped sort and document the evidence collected from the car before submitting it to the property room. Officer Heinze recalled that he also submitted an amount of money recovered from the Defendant to the property room, which was determined to be $1,923.

Sergeant Joshua Lefler had experience as a Crime Suppression Unit officer with the MNPD and was qualified by the court as an expert in the field of street-level narcotics and drug jargon. Sergeant Lefler testified that he responded to the shooting at James Cayce Homes and assisted other officers and first responders in securing the scene. He was then directed to the related scene at I-24 where the gold sedan had been pulled over in order to transport the Defendant to the police station. When Sergeant Lefler retrieved the Defendant from the back of another patrol car, the Defendant announced, "Everything y'all found is mine." After being placed in the back of Sergeant Lefler's patrol car, the Defendant motioned for a nearby detective, to whom he said, "They didn't know everything that was gonna happen."

Once he arrived at the police station with the Defendant, Sergeant Lefler assisted Officer Douglas with documenting the evidence recovered during the arrest. Sergeant Lefler personally packaged 1.9 grams of powder cocaine; two bags of crack cocaine, weighing respectively 9.8 grams and 1.5 grams; two bags of heroin, weighing respectively 2.2 grams and 0.2 grams; and three pills containing hydrocodone. The was also $1,923 in cash that was sorted into four separate bundles.

With regard to heroin, Sergeant Lefler testified that it was typically sold in "points or one-tenth of a gram," and that 0.1 or 0.2 grams would be a "very, very typical" street-level transaction. He "found it interesting that there was kind of a larger supply of heroin with the 2.2 grams, and then there was a small, kind of ready-to-sell package of heroin as well." With regard to crack cocaine, Sergeant Lefler explained that it is less expensive than heroin and therefore "traded in slightly higher quantities[.]" He said crack cocaine was traded at street-level in amounts varying from 0.1 grams to 3.5 grams. As with the heroin, Sergeant Lefler surmised that the fact the crack cocaine was packaged in two bags, a large quantity and then a smaller quantity, was indicative "of a supply . . . [and] then . . . a ready-to-sell component[.]" Sergeant Lefler believed that the amount of powder cocaine was "on the high end of something a user would have . . . [and] more indicative of something that a seller would have[.]"

Sergeant Lefler noted that it was unusual for someone to possess heroin and hydrocodone, both opioids, for personal use and that it was also unusual for a user to

possess two variants of cocaine. In addition, Sergeant Lefler said that it was unusual for a user to possess multiple types of illicit narcotics. Sergeant Lefler further noted that he had seen empty plastic bags and cigarillo wrappers, like the Defendant possessed, used to package narcotics. With regard to the amount of cash found on the Defendant, Sergeant Lefler said that "it is rather typical for someone who is selling narcotics to have a large amount of currency on their person[,]" and it is "also fairly typical for that money to be divided into separate quantities."

Sergeant Lefler testified that he listened to certain jailhouse phone calls and verified the Defendant's voice in the calls based on his interactions with the Defendant. The parties stipulated that the Defendant placed several phone calls while housed in the Davidson County Sheriff's Office using his unique identifying PIN number. A transcript of the calls was given to the jury, and the recording was played in court. Sergeant Lefler highlighted several statements in the call that he believed to be a reference by the Defendant to selling drugs and the money he made from selling drugs. Such statements included the Defendant's reference to "pharmaceuticals" and a "hustle," the fact that the Defendant stored cash in a vehicle and not a bank, and the Defendant's claim that the police stole his money, which was consistent with drug-dealers knowing about police seizure of assets.

Emily Bright, the forensic drug identification supervisor with the MNPD crime laboratory, analyzed the substances recovered from the Defendant. Ms. Bright's tests showed that the net weights and makeup of the substances seized that day were 1.92 grams of heroin, 1.04 and 8.24 grams of cocaine, and three tablets of oxycodone.

Officer Charles Linville, a crime scene investigator with the MNPD, processed the aforementioned gold car after it was towed to the crime scene office. Inside the car, Officer Linville found four cell phones, a box of ammunition containing seven cartridges, a pair of black boots, a black hooded sweatshirt, a jacket, a set of keys attached to a speaker, and leafy green plant material. Officer Linville also processed the three firearms that were recovered by other officers for fingerprints. The officer lifted latent fingerprints from one of the guns, the Glock Model 19, and submitted them for further testing. He also swabbed each of the guns for DNA, which he submitted for further testing. He examined recovered ammunition cartridges but was unable to develop any latent fingerprints.

Julie Ellis with the Forensic Biology Unit of the MNPD's crime laboratory testified that she examined items of clothing worn by the victim, as well as items of clothing retrieved from the gold sedan. She also obtained buccal swabs from the Defendant and the two co-defendants, a blood sample and fingernail clippings from the victim, and swabs from the recovered firearms. Ms. Ellis prepared a report of her findings, including that blood was detected on some of the victim's clothing and her fingernail clippings but not on the black hooded sweatshirt recovered from the gold sedan or on the triggers of the

firearms. No foreign DNA was found on the victim's fingernail clippings. There was a mixed DNA result with the presence of multiple contributors found on the victim's shirt and the hooded sweatshirt recovered from the gold sedan, which made comparison impossible. Likewise, mixed DNA results and/or insufficient samples were obtained from the swabs of the firearm triggers and muzzles, making comparisons impossible. In sum, other than the fingernail clippings taken from the victim and the buccal swabs taken from the Defendant and two co-defendants, Ms. Ellis was not able to link another person by DNA to any of the other items.

Bridget Chambers, a firearms examiner with the MNPD crime laboratory, testified that she examined the three firearms recovered from the gold sedan, as well as nineteen nine-millimeter cartridge casings. Ms. Chambers determined that fourteen of the cartridge casings found at the scene were fired from the Glock nine-millimeter pistol. The five other cartridge casings were fired from an unknown weapon. Ms. Chambers also examined the five bullets taken from the victim's body during autopsy, of which she conclusively determined that two came from the Glock pistol. The other bullets could not be conclusively linked to the Glock but were excluded as having been fired by the other guns found in the car.

Sergeant Matthew Lachance testified that he was a patrol sergeant with the MNPD on August 15, 2014, and on that date responded to a domestic dispute complaint. When he arrived on the scene, he discovered that the Defendant had sustained a penetrating knife wound in the lower right back area and was receiving medical attention. Sergeant Lachance's investigation revealed that the Defendant was in a relationship with Candace Kelly, who was the sister of the victim in the present case. Evidently, there was an argument between the Defendant and Ms. Kelly that led to a further argument with the victim, who then stabbed the Defendant. The victim was prosecuted as a result of the incident. On cross-examination, Sergeant Lachance stated that it was his understanding that the stabbing damaged one of the Defendant's kidneys, requiring surgery. He recalled that when he spoke to the Defendant at the scene, the Defendant "was sort of coming in and out of consciousness[.]" He also recalled that the victim had a small abrasion on one of her knees and complained of back and neck pain.

Detective William Bolan, a retired detective from the MNPD, testified that on March 28, 2017, he was assigned to be the lead detective in the murder of the victim and attempted murder of Mr. Morton. Detective Bolan went to the scene of the shooting that day and talked to witnesses, including Mr. Morton. Mr. Morton described the shooter as "a male black, thin, dark complexion with balding hair and in his 30's, dressed in black." Mr. Morton told Detective Bolan that he did not get a good look at the shooter's face because "he was too busy running, trying not to get shot."

Detective Bolan was informed that a gold, four-door car was seen fleeing the scene and that a BOLO had been issued. While he was interviewing Mr. Morton, Detective Bolan was told that a vehicle matching the description had been stopped and that three men were inside, one of whom matched the description of the shooter. Detective Bolan later learned that three handguns, cellphones, and narcotics were recovered in a search of the car. A black, zip-up hooded sweatshirt was also found in the car.

The Defendant was brought in for questioning and was cooperative with Detective Bolan. Photographs of the Defendant taken at the time of the interview, the night of March 28 and March 29, 2017, were introduced during Detective Bolan's testimony and showed the Defendant wearing all black clothing and with no apparent injuries. Detective Bolan recalled that one of the co-defendants was wearing a white Atlanta Braves jersey over a white tee shirt, and the other co-defendant was wearing a black sweatshirt over a white tee shirt. However, he elaborated that the co-defendant with the sweatshirt was wearing whitewashed jeans that did not look black at all.

Detective Bolan then discussed several of the steps he took in his investigation, including having the recovered firearms tested for DNA evidence and fingerprints. Only one latent print was developed on one of the weapons, but it was not good enough quality to be of value. Detective Bolan also ordered ballistics analysis of the guns, shell casings, and bullets recovered from the victim's body.

Detective Bolan testified that he reviewed security video footage obtained from the James Cayce Homes. The video showed the gold sedan arrive into the area from Shelby Avenue and South Eighth Street and park in a parking lot. The Defendant and the two co-defendants got out of the vehicle and walked through buildings seventy-eight and seventy-nine. One of the co-defendants stopped to talk to another person, and the Defendant and other co-defendant continued on to the playground where they had contact with the victim. The Defendant was wearing a black hooded sweatshirt with what appeared to be white specks on it and black pants. The co-defendant with him was wearing an Atlanta Braves jersey and blue jeans.

The video showed that the victim had been at the basketball court, and then she walked over and started talking to Mr. Morton. The Defendant and co-defendant came up to the victim and talked to her before the Defendant ultimately hugged her and walked away. It looked as though the Defendant was headed back towards the car, but then he went out of view from the camera. The Defendant reappeared with his hood now pulled up over his head, coming around a building, back toward the playground, and shooting at the victims. The Defendant left in the direction that he came and returned to the car. The car was seen leaving toward Shelby Avenue. Based on his view of the video, Detective Bolan described that after the victim dropped to the ground, the Defendant turned and

started shooting at Mr. Morton and then resumed shooting at the victim. Detective Bolan estimated that three minutes elapsed from the time the Defendant initially left the playground and when he returned and fired the shots. Asked the Defendant's demeanor during those three minutes, Detective Bolan described, "He was definitely a man on a mission. He walked directly from one location, rounded the corner, and then came right back and threw his hoody up and he seemed like he was walking with a purpose." Detective Bolan noted that the video showed that the co-defendants also had guns, but they did not pull out their guns until after the Defendant had fired the shots.

On cross-examination, Detective Bolan agreed that no one was wearing the black hoody when the police stopped the gold car and that from the video one could not tell what the shooter was wearing underneath the black pullover. Detective Bolan also agreed that when the shooter shifted positions as Detective Bolan described earlier, one could not tell from the video whether the gun was actually firing.

On redirect, Detective Bolan testified that he was able to tell from the video that the shooter was wearing black pants and black shoes in addition to the black hooded sweatshirt. Detective Bolan also stated that although he could not see gunshots coming out of the gun, the victim dropped to the ground "[a]lmost instantaneously" after the Defendant rounded the corner of the building and began firing, and nothing on any angle of the video indicated that there was more than one shooter.

Terry Faimon testified that he worked for the Metro Nashville District Attorney's Office, and one of his duties was to handle electronic monitoring and surveillance of jailhouse phone calls. He introduced a detailed report of all the calls the Defendant made from the jail, along with a recording of those calls on a disc. Mr. Faimon said that he listened to the calls and was able to verify that the voice he heard was that of the Defendant. Mr. Faimon stated that the Defendant had the nickname, "Boss," and one of the co-defendants, Latraveous Burns, had the nickname, "Lay-Lay" or "Lay."

Mr. Faimon stated that the Defendant made a call on March 31, 2017, at 9:25 p.m., which was played for the jury. During the call, the Defendant told the male to whom he was talking that "he was gonna take all those charges where the other occupants in that car were – didn't have to worry about it." The Defendant also said that he had debated firing at the arresting officers when the police surrounded the car, but he did not do so because of one of the other occupants in the car.

In a call from March 31, 2017, at 9:44 p.m., the Defendant was talking with another man, and the other man said that "Ronnie" was going around telling people that the Defendant tried to shoot him. The Defendant replied, "I did, umm-ummm. Man, you should've seen me boy, ohhh."

In a call from April 1, 2017, at 9:24 a.m., the female to whom the Defendant was talking asked the Defendant, "what the hell was you thinking . . . I wanna know what was going on in your head." The Defendant responded, "You know I'm the most vindictive person in the world." He told the female, "[R]eally I don't regret what I done. I just regret how I done it." He said that it had "steadily been f*cking with [him]" that people had tried to make it look like it was his fault that the victim stabbed him. The female pointed out that news stories about the present case did not mention that the victim had stabbed him previously, instead saying that she had defended herself from the Defendant's attack.

The Defendant testified on his own behalf, stating that he did not remember shooting at anybody. He explained that the reason he told the police that he was responsible for everything and said in the phone call that he would take all the charges was because Latraveous Burns, one of the co-defendants, was his brother, and he wanted to protect him. The Defendant recalled that he went to the James Cayce Homes that day with Mr. Burns to try to diffuse a situation between Mr. Burns and a friend of the family, and he happened to run into the victim. He had known the victim for a long time and had dated her sister. He had only seen the victim briefly since the stabbing incident, but he did not have any ill will towards her. The Defendant stated that the stabbing by the victim was "traumatizing" and resulted in the loss of a kidney. He said that the incident weighed on him for years and affected his frame of mind.

Turning back to the day of the incident at hand, the Defendant testified that he did not recall hugging the victim and only knew that he had done so because of the video. He said that everything that happened thereafter was "a blur," and he had no memory of the shooting. The next thing he remembered was being in the car with his brother and his brother's friend.

Asked about his statement in one of the jailhouse calls that he did not regret what he had done, the Defendant said that he did not know what he meant by the statement but then speculated that he "felt like how can I regret something I don't even remember doing." As for saying he was vindictive, the Defendant said that he meant that "when something messes with me, it messes with me for a long time," including with the way he is able to think. On the stand, the Defendant said that he regretted what he had done, although the whole thing "was surreal," and he did not "even remember that moment."

On cross-examination, the Defendant agreed that the victim stabbed him in August 2014. He said that he and the victim's sister, Candace Kelly, broke up after the stabbing but eventually got back together. He acknowledged that he crossed paths with the victim at various times from the time of the stabbing to the shooting in the present case and that they did not have any other altercations during that two-and-a-half-year time period.

The Defendant stated that he did not know Mr. Morton and denied that he admitted to shooting Mr. Morton in one of his jailhouse phone calls. However, he acknowledged that it was his voice on the phone call and that he was laughing. The Defendant agreed that he traveled to and from the scene in a gold sedan that belonged to Mr. Burns and also that he was holding a firearm when Officer Douglas approached the car. The Defendant said that he did not remember wearing a black hooded sweatshirt or what kind of gun he had at the James Cayce Homes because he did not remember being there. The Defendant acknowledged that he was carrying drugs and cash when they were stopped by the police.

The Defendant claimed that he received a call informing him of the victim's murder while they were driving in the gold car and that was how he knew of it in order to tell the detective that the co-defendants did not know what was going to happen at the James Cayce Homes. The Defendant debated the meaning of some of the statements he made in the jailhouse phone calls and/or denied making them. The Defendant asserted that Detective Bolan told him that he would not charge Mr. Burns if the Defendant confessed, so he confessed "after asking for a lawyer twice and writing more than one confession because he said that the first two weren't good enough." However, the Defendant acknowledged that he asked to speak to officers after having asked for a lawyer.

Following the conclusion of the proof, the jury convicted the Defendant as charged of premeditated first-degree murder, attempted first-degree murder, employing a firearm during the commission of a dangerous felony, possession of cocaine with intent to sell or deliver, possession of heroin with intent to sell or deliver, possession of a firearm by a felon with a prior felony drug conviction, and possession of oxycodone. The trial court conducted a sentencing hearing, after which it imposed an effective sentence of life plus ten years.

## ANALYSIS

The Defendant challenges the sufficiency of the evidence with regard to his convictions for premeditated first-degree murder, attempted first-degree murder, possession of cocaine with intent to sell or deliver, possession of heroin with intent to sell or deliver, and employing a firearm during the commission of a dangerous felony.[2]

When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the

---

[2] The Defendant does not contest his convictions for possession of a firearm by a felon with a prior felony drug conviction and possession of oxycodone.

crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319, (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence.  State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A criminal offense may be established entirely by circumstantial evidence.  State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010).  It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are consistent with the guilt of the defendant and inconsistent with his innocence.  State v. James, 315 S.W.3d 440, 456 (Tenn. 2010).  In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence.  See State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact.  See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).  "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."  State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).  Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation.  The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand.  Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses.  In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant

has the burden of demonstrating that the evidence is insufficient."  State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

## Murder and Attempted Murder

First-degree murder is defined as "[a] premeditated and intentional killing of another."  Tenn. Code Ann. § 39-13-202(a)(1).  "Premeditation" is

> an act done after the exercise of reflection and judgment.  "Premeditation" means that the intent to kill must have been formed prior to the act itself.  It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.  The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).

The "element of premeditation is a question of fact" for the jury to determine based upon a consideration of all the evidence.  State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000) (citing State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997)).  "[P]remeditation may be established by any evidence from which a rational trier of fact may infer that the killing was done 'after the exercise of reflection and judgment' as required by Tennessee Code Annotated section 39-13-202(d)."  State v. Davidson, 121 S.W.3d 600, 615 (Tenn. 2003).  A jury may infer premeditation from circumstantial evidence surrounding the crime.  See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Addison, 973 S.W.2d 260, 265 (Tenn. Crim. App. 1997).  There are several factors which our courts have concluded may be evidence of premeditation: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing."  Bland, 958 S.W.2d at 660.  An additional factor from which a jury may infer premeditation is evidence establishing a motive for the killing.  See State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998).

In cases where the defendant has been charged with the attempted commission of a crime, there must be evidence that the defendant acted "with the kind of culpability otherwise required for the offense," acted "with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]"  Tenn. Code Ann. § 39-12-101(a), (a)(2).

The Defendant asserts that he did not have the requisite culpable mental state to support his convictions for first-degree premeditated murder and attempted first-degree murder, pointing to his inability to recall the shooting incident and his claim that "he no longer bore [the victim] any ill will or had any animosity for her prior assault on him." He contends that "[n]o reasonable trier of fact could determine that he had a 'conscious objective or desire' [to commit murder] when he . . . clearly testified that he did not recollect the events." With regard to the attempted murder conviction, in addition to his assertion that he could not recall the incident, the Defendant argues that the State's proof failed to show that he "aimed to kill or harm Mr. Morton" or that there was "any premeditation in shooting at Mr. Morton."

In the light most favorable to the State, the evidence shows that the victim stabbed the Defendant during a domestic argument in 2014, which resulted in the loss of the Defendant's kidney. Although the Defendant claimed that he no longer felt any ill will towards the victim, he acknowledged at trial that the incident weighed on him for years and affected his frame of mind. Phone calls were entered into evidence in which the Defendant admitted to shooting at the victim and Mr. Morton, said that he did not regret what he had done, and explained as the reason for his actions that he was "the most vindictive person in the world." As its prerogative, the jury chose to disbelieve the Defendant's testimony at trial that he no longer held any animosity towards the victim, as well as his attempts to explain his comments in the jailhouse phone calls. Also in its prerogative, the jury chose to disbelieve the Defendant's assertion that he did not recall the shooting incident and thus could not have premeditated his actions. With regard to Mr. Morton, Mr. Morton testified that two of the shots were directed at him, and Detective Bolan testified that the surveillance footage showed that the shooter shifted position and appeared to start shooting at Mr. Morton and then resumed shooting at the victim. The evidence is sufficient for a rational trier of fact to conclude that the Defendant committed first-degree premeditated murder and attempted first-degree murder.

## Drug Offenses

Tennessee Code Annotated section 39-17-417(a)(4) provides that it is an offense for a defendant to knowingly possess a controlled substance with intent to sell or deliver it. The Defendant claims that there was insufficient proof that he possessed the heroin and cocaine with intent to sell or deliver and not "merely possessing the controlled substance[s] for personal use."

Our supreme court has stated that "intent can rarely be shown by direct proof and must, necessarily, be shown by circumstantial evidence." Hall v. State, 490 S.W.2d 495, 496 (Tenn. 1973). "It may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest,

that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing." Tenn. Code Ann. § 39-17-419. "Other relevant facts" that can give rise to an inference of intent to sell or deliver include the absence of drug paraphernalia, the presence of a large amount of cash, the packaging of the drugs, and the street value of the drugs. See, e.g., State v. Logan, 973 S.W.2d 279, 281 (Tenn. Crim. App. 1998) (finding evidence of a large amount of cash found in conjunction with several small bags of cocaine provided sufficient evidence of intent to sell); State v. Brown, 915 S.W.2d 3, 8 (Tenn. Crim. App. 1995) (recognizing that the absence of drug paraphernalia, and manner of packaging of drugs supported an inference of intent to sell); State v. Matthews, 805 S.W.2d 776, 782 (Tenn. Crim. App. 1990) (finding that testimony concerning the amount and street value of drugs was admissible to infer an intention to distribute); State v. Charles Benson, No. M2003-02127-CCA-R3-CD, 2004 WL 2266801, at *8 (Tenn. Crim. App. Oct. 8, 2004) (finding that the absence of drug paraphernalia and testimony of value and amount of 3.3 grams of cocaine sufficient for the jury to infer the defendant's intent to sell and deliver it), perm. app. denied (Tenn. May 23, 2005); State v. William Martin Frey, No. M2003-01996-CCA-R3CD, 2004 WL 2266799, at *8 (Tenn. Crim. App. Oct. 6, 2004) (holding that testimony of 1.8 grams of cocaine, a stack of cash, and absence of drug paraphernalia constituted circumstances from which jury could reasonably infer intent to sell), perm. app. denied (Tenn. Feb. 28, 2005).

In this case, when officers stopped the Defendant's car after the shooting, the Defendant had in his possession: 1.9 grams of powder cocaine; two bags of crack cocaine, weighing respectively 9.8 grams and 1.5 grams; two bags of heroin, weighing respectively 2.2 grams and 0.2 grams; and three pills containing hydrocodone. He also had $1,923 cash in different denominations, sorted into four separate bundles.

Sergeant Lefler, testifying as an expert in the drug trade, discussed the typical street-level transaction amounts of cocaine and heroin and noted that the Defendant possessed each of the drugs in two bags, a large quantity and then a smaller quantity, which was indicative of a supply and a ready-to-sell component. Sergeant Lefler stated that it was unusual for a user to possess multiple types of illicit narcotics and that empty plastic bags and cigarillo wrappers, like the Defendant possessed, were often used to package narcotics. With regard to the amount of cash found on the Defendant, Sergeant Lefler said that "it is rather typical for someone who is selling narcotics to have a large amount of currency on their person[,]" and that it is "also fairly typical for that money to be divided into separate quantities."

Sergeant Lefler also listened to jailhouse phone calls made by the Defendant in which the Defendant made several statements Sergeant Lefler believed to be a reference by the Defendant to selling drugs and the money he made from selling drugs. Such statements included the Defendant's reference to "pharmaceuticals" and a "hustle," the fact

that the Defendant stored cash in a vehicle and not a bank, and the Defendant's claim that the police stole his money which was consistent with drug-dealers knowing about police seizure of assets.

In sum, there was sufficient evidence from which the jury could infer that the Defendant possessed the cocaine and heroin with intent to sell or deliver.

**Weapon Offense**

Tennessee Code Annotated section 39-17-1324(b)(1) provides that "[i]t is an offense to employ a firearm during the . . . [c]ommission of a dangerous felony[.]" Id. As charged in count three of the indictment, attempted first-degree murder is one of the enumerated dangerous felonies. Id. § 39-17-1324(i)(1)(A). The statute also provides for a sentence enhancement if the defendant had a prior felony conviction at the time of the offense, which is the case here. See id. § 39-17-1324(h)(2).

The Defendant asserts that the evidence is insufficient to support his conviction on this charge because there was "insufficient evidence for the underlying dangerous felony offense of Attempted First Degree Murder against Mr. Morton." As we addressed above, the evidence was more than sufficient to support the Defendant's conviction for attempted first-degree murder; therefore, the Defendant is not entitled to relief on this issue.

The Defendant additionally asserts that the statute's enhancement trigger was misapplied because his prior conviction was for possession with intent to distribute a controlled substance which "does not, by definition, involve dangerous behavior and cannot be deemed a dangerous felony by the General Assembly without some causal connection between the offense conduct and the enhancement." Although the Defendant argues it should be otherwise, the Legislature has clearly included possession with intent to distribute a controlled substance as one of the felonies it considers "dangerous," see id. § 39-17-1324(i)(1)(L), and we will not second-guess a clear Legislative enactment.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE

- 16 -